UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN THOMAS WOLFENBARGER,

                Plaintiff,

v.

HEIDI WASHINGTON, *et. al.*,

                Defendants.

_____/

Civil Action No. 24-10616

Mark A. Goldsmith
United States District Judge

David R. Grand
United States Magistrate Judge

## **REPORT AND RECOMMENDATION TO GRANT IN PART AND DENY IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 75)**

*Pro se* plaintiff John Thomas Wolfenbarger ("Wolfenbarger"), an inmate of the Michigan Department of Corrections ("MDOC"), filed this civil rights action pursuant to 42 U.S.C. § 1983 related to an alleged staff-orchestrated assault against him that occurred on May 1, 2022, while he was residing at the Gus Harrison Correctional Facility ("ARF"). (ECF No. 16).[1]  Wolfenbarger names as defendants MDOC Director Heidi Washington; the following Lakeland Correctional Facility ("LCF") employees: Warden Bryan Morrison ("Morrison"); Deputy Warden Troy Chrisman ("Chrisman"); Assistant Deputy Warden Russell Rurka ("Rurka"); Resident Unit Manager Scott Cline ("Cline"); Inspector William Matthews ("Matthews"); and Grievance Coordinator Jennifer Rohrig ("Rohrig")

---

[1] Defendants aver that Wolfenbarger cannot "rely on his original complaint because that was superseded and replaced by his amended complaint." (ECF No. 90, PageID.1644).  "[T]he Court has made clear that Wolfenbarger's first amended complaint in ECF No. 16 is the only operative complaint in this case." (ECF No. 65, PageID.1315, n. 1).  Thus, Wolfenbarger's first amended complaint, ECF No. 16, is the only complaint on which the Court relies.

(collectively, "LCF Defendants"); the following ARF employees:[2] Grievance Coordinator Lawson ("Lawson") and a handful of "unknown" corrections officers and other employees ("John Does") (collectively, "ARF Defendants"); and the Thumb Correctional Facility ("TCF") mailroom supervisor and TCF employee R. Buhl. (ECF No. 16, PageID.113-15). Defendant Washington is sued in her official capacity, while all other defendants are sued in their individual capacities. (*Id.*, PageID.110). The case was referred to the undersigned for all pretrial matters pursuant to 28 U.S.C. § 636(b). (ECF No. 15).

Now pending before the Court is a Motion for Summary Judgment, which was filed by the named LCF and ARF defendants (collectively, "Defendants") on September 30, 2025. (ECF No. 75). Appearances of counsel have not yet been entered on behalf of defendants Washington, West, and R. Buhl, but Defendants assert that "the arguments in this motion apply equally to them." (*Id.*, PageID.1434). Wolfenbarger filed a response on March 19, 2026 (ECF No. 86), and Defendants filed a reply on May 4, 2026. (ECF No. 90).

The Court finds that the facts and legal issues are adequately presented in the briefs and on the record, and it declines to order a hearing at this time.

I.      RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that Defendants' Motion

---

[2] In his response to Defendants' Motion to Dismiss, Wolfenbarger "dismisses all claims as to [ARF] Warden Sherman Campbell as a Defendant." (ECF No.87, PageID.1579). Therefore, the Court will not address claims against Warden Campbell, and he should be dismissed from the case.

for Summary Judgment **(ECF No. 75)** be **GRANTED IN PART** and **DENIED IN PART.**

II.     **REPORT**

   A.        **Factual Background**

Wolfenbarger, acting *pro se* at the time, commenced this action on March 11, 2024. (ECF No. 1).   On June 4, 2026, attorney Kama Patel ("Patel") began representing Wolfenbarger and filed a lengthy amended complaint on September 3, 2024.   (ECF No. 16).   More than a year later, on December 9, 2025, the Court granted Patel's motion to withdraw, and Wolfenbarger has since acted *pro se*.   (ECF No. 79).   The Court summarizes the allegations in the amended complaint below.

In 2020, Wolfenbarger joined the Warden's Forum, acting as a liaison between prisoners and LCF Warden Morrison.   (ECF No. 16, PageID.126).   Most notably, Wolfenbarger raised serious health and safety concerns about LCF, such as alleged contaminated drinking water and poor ventilation.   (*Id.*, PageID.119-20, 126-27). However, after witnessing "continued denial of reformative action," Wolfenbarger, without Morrison's knowledge, advised a newspaper reporter, Paul Egan, about these issues "[t]o bring societal pressure against [] Morrison and/or [] Washington to address inhumane living conditions . . ."   (*Id.*, PageID.121).   He also shared Mr. Egan's contact information with other prisoners.   (*Id.*, PageID.121-22).

Wolfenbarger alleges that, in July 2021, Morrison hired him as a "property room clerk."   (*Id.*, PageID.122).   Around August 2021, Morrison learned that prisoners had been complaining to Egan and set out to determine which prisoners were involved.   (*Id.*).   He asked Wolfenbarger to investigate, warning that whoever was responsible would be sent

3

"over the bridge" to a prison in Michigan's Upper Peninsula. (*Id.*, PageID.122-123). Over the ensuing months, LCF Assistant Deputy Warden ("ADW") Rurka and LCF Deputy Warden ("DW") Chrisman questioned Wolfenbarger "at length" about why prisoners were contacting Egan, which indicated to Wolfenbarger that "LCF administrators were cohesively investigating Mr. Egan's communications with prisoners." (*Id.*, PageID.123-24). At some point, Wolfenbarger allegedly "discovered and relayed to other prisoners that U.S. Mail posted to Mr. Egan was being confiscated by LCF mailroom staff and given to Inspector Matthews." (*Id.*, PageID.126).

In January of 2022, Wolfenbarger became Chairman of the Warden's Forum. (*Id.*, PageID.126). In March or April 2022, Rurka again raised concerns to him about prisoners "reaching out to the media when it was a facility level issue." (*Id.*, PageID.127). Around the same time, DW Chrisman questioned Wolfenbarger a second time about prisoner communications with Egan and stated that "LCF was working with Central Office to have 'Egan' removed from all JPAY accounts at LCF and was refusing to allow emails to be sent to Egan." (*Id.*, PageID.128).

On April 11, 2022, Resident Unit Manager ("RUM") Cline allegedly responded to concerns about mold by "calling it 'mildew,'" even though two weeks later "dangerous mold [spores] were found present within the units 'inspected' by [] Cline." (*Id.*). Throughout the month of April, Wolfenbarger, as Chairman of the Warden's Forum, wrote several complaints to Chrisman, Washington, and Morrison about mold concerns and contaminated drinking water. (*Id.*, PageID.129-30). On April 26, 2022, "[a]fter four months of [Wolfenbarger's] complaints[,] an audit by [MDOC Director] Washington's

4

office prompted [] Morrison's admittance of mold present within all pole barn [housing units]." (*Id.*, PageID.130).  Morrison decided that "out of an abundance of caution," "600+ prisoners would be transferred throughout the state until the mold was removed in full." (*Id.*, PageID.130).   However, Morrison made "declarations" that "[a]ll transferring prisoners would be returned to LCF within 60-90 days unless they received misconducts and were labeled behavioral problems preventing [return]" and "would be given their job assignments back upon return."   (*Id.*, PageID.130-31).   Wolfenbarger alleges that Washington and Morrison "had assured" that "[n]o vital prisoner workers would be transferred," including "clerks."

Wolfenbarger, who held one of nine "clerk positions" at LCF, allegedly asked Morrison if "he was safe from transfer as the lone property room clerk and Def. Morrison stated 'yeah, you're good.'"  (*Id.*, PageID.131).  Morrison also allegedly instructed Wolfenbarger "to assist in the pack-up process to take place over the next days," and from April 27-29, 2022, Wolfenbarger "followed orders transporting and sorting prisoner property (footlockers, appliances and duffel bags) between units," during which he "witnessed acts of intentional sanctioned theft, destruction and disposal of cartloads of prisoner's property by staff . . ."  (*Id.*, PageID.132).

Despite assurance that he would remain at LCF, Wolfenbarger alleges that, on April 29, 2022, correctional officers approached him at his bunk area, ordered him to follow them, denied his request to pack/secure his personal property, forcefully escorted him to LCF segregation, strip searched him, and instructed him to await transfer to ARF.  (*Id.*, PageID.132).  Wolfenbarger was then transferred to ARF and strip searched by the intake

5

correctional officer assigned for prisoner transfers ("John Doe 1").  (*Id.*, PageID.133). During this process, John Doe 1 allegedly stated to Wolfenbarger, "I don't know who you pissed off but you're going to the dumping ground . . . Someone doesn't like you . . . You're going to the unit full of our rejects who are waiting to go to level 4 and 5 and it's off the hook. . . We're over there tasering them all the time. . . You're on someone's shit list." (*Id.*).  Wolfenbarger informed John Doe 1 that he was classified as "level II medium security," but John Doe 1 sent Wolfenbarger "to living quarters not consistent with his security level" based on "information received from his superior, the 'Shift Commander' [] who was responsible for assigning [Wolfenbarger] a cell" ("John Doe 2").  (*Id.*, PageID.134).  Wolfenbarger's cellmate "was in fact classified as a maximum-security prisoner."  (*Id.*).  Wolfenbarger later learned that correctional officers had told other prisoners that he has "got to go[,] [h]e can't stay here," which Wolfenbarger claims is code "to initiate violence on prisoners through other inmates."  (*Id.*).

On April 30, 2022, Wolfenbarger received his personal property and "informed the officer of missing items," including his Warden's Forum "paperwork, notes and invaluable legal documentation with explicit times and dates of staff misconduct verifiable by video surveillance security camera footage meant for Mr. Egan's investigation," as well as "letters [he] sent to government agencies and various investigative reporters explaining LCF administrative incompetence."  (*Id.*, PageID.134-35).  That same day, Wolfenbarger wrote to ARF Warden Campbell, requesting that Campbell investigate the statements made by John Doe 1 and John Doe 2, and remove him from "a hostile living environment full of prisoners not of [his] custody level, such as his cellmate."  (*Id.*, PageID.135-36).

6

Wolfenbarger alleges that on May 1, 2022, "while brushing his teeth in the wing bathroom less than 30 feet from the C/O's station," he was violently "assaulted and rendered unconscious." (*Id.*, PageID.136). He alleges that a "portion of his jaw was caved into the back of his mouth, an eye [was] swollen shut, there were multiple lacerations, his mouth was torn open, and he was covered in dripping blood." (*Id.*). "Realizing he needed medical care," Wolfenbarger "proceeded unsteadily dripping blood down the hallway to the [] C/O's station," at which point two correctional officers ("John Doe 3" and "John Doe 4") "looked at [him] without surprise" and did not help him get to healthcare. (*Id.*, PageID.136-37). "Upon entering health care," a correctional officer and nurse "immediately administered care recognizing the situation's urgency," and the correctional officer contacted the control center, stating, "I think someone just tried to kill this guy." (*Id.*). Wolfenbarger was placed in an ambulance to be transferred to the hospital. (*Id.*, PageID.138).

Wolfenbarger alleges that, inside of the ambulance, a corrections officer ("John Doe 5") stated, "You know why this happened, you got fucked up because you walked in the unit and told officers you were going to fuck all their boys" and allegedly "wav[ed] a cell phone in [his] face indicating a text stating such." (*Id.*, PageID.139). Wolfenbarger alleges that "for the first time [he] understood staff had placed a 'hit' on him and were now covering their tracks." (*Id.*, PageID.139). At the hospital, Wolfenbarger heard John Doe 5 state to his "coworker," "[w]e should take him back to let them finish the job." (*Id.*). Wolfenbarger was ultimately diagnosed with facial fractures requiring emergency surgery, contusions, lacerations, a possible concussion, and damage to hearing and a lip requiring

7

sutures to reconnect." (*Id.*, PageID.140).

Wolfenbarger alleges that he had "emergency surgery" the day of the assault, followed the next day by "facial reconstructive surgery." (*Id.*, PageID.140). Wolfenbarger "awoke from surgery that day to an introduction by ARF Inspector West wanting to ask questions." (*Id.*). Inspector West told him, "We have someone in custody who is on camera assaulting you . . . we tracked your movements and saw you had no altercations with anyone and had only just gotten there . . . we've been told it was a paid hit and we're looking into someone you may not have known was there at ARF . . ." (*Id.*, PageID.140). However, Wolfenbarger also claims that Inspector West never identified the assailant to him, "destroyed investigative evidence," and "covered up unconstitutional conduct by ARF staff. . ." (*Id.*, PageID.146-50).

On May 6, 2022, Wolfenbarger was transferred from the hospital to "a medically fragile/frail unit" at Thumb Correctional Facility ("TCF"). (*Id.*, PageID.142). Wolfenbarger alleges that, during the week of May 9, 2022, he "learned his retaliatory transfer and subsequent assault/attempted murder was intentional," as Morrison and LCF administrators allegedly "had discovered [Wolfenbarger] was the connection between reporter, Paul Egan, and the LCF's prisoner population." (*Id.*, PageID.143). Wolfenbarger alleges that he "learned" from one "source" that "LCF staff had 'sent word' to ARF staff that he had 'tried to close LCF' and was 'not to return to LCF at all costs," while a "second source" informed him that "the transfer and attempt on his life was orchestrated by staff at LCF and ARF." (*Id.*, PageID.143). Wolfenbarger claims an Acting Assistant Deputy Warden at TCF told him, "Looks like you should have kept your mouth shut."

8

(PageID.143-44).

On May 14, 2022, while at TCF, Wolfenbarger wrote one letter to ARF Warden Campbell and one letter to LCF Warden Morrison. (ECF No. 75-3, PageID.1501, 1507-08). He dated both May 14, 2022, and in both he wrote that he had not been able to write earlier due to the medical procedures and recovery. (*Id.*). In both letters, he described the allegedly retaliatory transfer from LCF to ARF, the attack, and his allegations against staff, as summarized above. (*Id.*). He also asked for the identity of the above-referenced John Does, as well as others. (*Id.*). Neither letter was answered, and on June 3, 2022, Wolfenbarger submitted his first Step I grievances about the assault and related matters to ARF and LCF, respectively. (ECF No. 75-3, PageID.1499, 1506).

Based on the above allegations, Wolfenbarger brings several claims, which, early in his complaint, he summarizes as "violations of his First, Eighth, and Fourteenth Amendment of the United States Constitution" (including various "conspiracies" to violate those rights), and "[s]tate tort claims of Deliberate Indifference, Failure to Act, Failure to Intervene, Breach of Peace, Negligence, Intentional Infliction of Emotional Distress, Mental Anguish and Emotional Distress." (ECF No. 16, PageID.111).

On January 7, 2025, Defendants filed a "Motion to Strike or for More Definite Statement." (ECF No. 43). In his response brief, Wolfenbarger clarified his allegations, organizing them into 12 claims (or, as the parties sometimes refer to them, "counts"), which the Court outlined in its Order denying Defendants' motion as follows:

> 1. First Amendment claims against Morrison, Chrisman, and Rurka based on alleged "true verbal threats" made in retaliation for protected conduct of communicating with a reporter regarding

LCF's alleged inhumane living conditions. (ECF No. 16, PageID.157-58; ECF No. 46, PageID.687);

2. A *Monell* claim based on Morrison's alleged orchestrating and ratifying of retaliatory actions against Wolfenbarger for his protected conduct in facilitating an investigation into LCF's inhumane living conditions. (ECF No. 16, PageID.159-61; ECF No. 46, PageID.687);

3. A civil conspiracy claim based on the alleged agreement and plan among all Defendants to retaliate against Wolfenbarger for his protected conduct in facilitating an investigation into LCF's inhumane living conditions. (ECF No. 16, PageID.162-65; ECF No. 46, PageID.688);

4. First Amendment retaliation claims against Morrison, Chrisman, and Rurka based on allegedly instituting a "pressured campaign of extortion and coercion" to identify the source of inmate communication to Egan, transferring Wolfenbarger to ARF for his communications to Egan, and sanctioning an inmate assault/attempted murder after his transfer to ARF. (ECF No. 16, PageID.165-67; ECF No. 46, PageID.688);

5. First Amendment claims against Morrison, Chrisman, Rurka, and Matthews based on alleged illegal seizures of [] outgoing prisoner mail and confiscation of exculpatory legal documentation from Wolfenbarger's possession. (ECF No. 16, PageID.167-69; ECF No. 46, PageID.688);

6. Claims for intentional infliction of emotional distress against Morrison, Chrisman, Rurka, Matthews, Campbell, West, John Doe 1, and John Doe 5. (ECF No. 16, PageID.169-71; ECF No. 46, PageID.688);

7. Eighth Amendment deliberate indifference claims against Morrison and Rurka based on their alleged instructing of him to violate other prisoners' property rights, which fostered an environment of hostility by other inmates against Wolfenbarger;

8. Eighth Amendment deliberate indifference claims against defendants Morrison, Chrisman, Rurka, and Cline based on

10

inhumane living conditions at LCF;[3]

9. Eighth Amendment claim against defendants Morrison, Chrisman, Rurka, Cline, Matthews, Campbell, West, and John Does 1-5 based on allegedly facilitating unnecessary and wanton infliction of pain via a sanctioned inmate assault from other inmates, or otherwise failing to protect Wolfenbarger from such assault. (ECF No. 16, PageID.174-78; ECF No. 46, PageID.689);

10. An Equal Protection "class-of-one" claim based on his disparate treatment as the only "clerk" who was transferred to ARF and never returned to LCF. (ECF No. 16, PageID.178-79; ECF No. 46, PageID.689).

11. A civil RICO conspiracy alleging that Defendants formed an "association-in-fact" enterprise to deprive Wolfenbarger "of liberty and property" in order to "prevent[] their exposure to criminal and civil liabilities by silencing [his] rights of free speech" and seizing his property "without due process." (ECF No. 16, PageID.179-83; ECF No. 46, PageID.689); and

12. A claim against Washington for "purposefully acquiesce[ing] to Def. Morrison's custom, pattern, and practice of violating [Wolfenbarger's] rights to be free from the cruel and unusual punishment of deliberate indifference to the health and safety of a prisoner." (ECF No. 16, PageID.183-84; ECF No. 46, PageID.689).

(ECF No. 65, PageID.1326).

## B.        Standard of Review

Pursuant to Rule 56, the Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Pittman v. Cuyahoga Cty.*

---

[3] Defendants have also filed a motion to dismiss (ECF No. 74), which remains pending before the Court, and in his response to that motion, Wolfenbarger "voluntarily withdraws Count VII ("Deliberate Indifference") and Count VIII ("Deliberate Indifference to Health and Safety.")." (ECF No. 87, PageID.1579). Therefore, the Court will not address Counts 7 and 8, and those claims should be dismissed from this case.

*Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011).  A fact is material if it might affect the outcome of the case under governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, the Court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party.  *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009).  "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'"  *Wrench LLC v. Taco Bell Corp.,* 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).  In response to a summary judgment motion, the opposing party may not rest on its pleadings, nor "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact but must make an affirmative showing with proper evidence in order to defeat the motion."  *Alexander*, 576 F.3d at 558 (internal quotations omitted).

## C.    Analysis

In their motion, Defendants argue that Wolfenbarger failed to properly exhaust any of his claims and are thus entitled to summary judgment on all claims.

### 1.    The PLRA's Exhaustion Requirement

12

Under the Prison Litigation Reform Act ("PLRA"), a prisoner may not bring an action, "under [§ 1983] or any other Federal law," with respect to prison conditions until all available administrative remedies have been exhausted. 42 U.S.C. § 1997e(a); *Woodford v. Ngo*, 548 U.S. 81, 85 (2006). This "exhaustion" requirement serves two main purposes: it promotes efficiency by encouraging the resolution of claims at the agency level before litigation is commenced, and it protects administrative authority by allowing the agency an opportunity to correct its own mistakes before being hauled into federal court. *See Woodford*, 548 U.S. at 89. The Supreme Court has held that this "exhaustion requirement requires proper exhaustion." *Id.* at 93. Proper exhaustion requires "compliance with an agency's deadlines and other critical procedural rules." *Id.* at 90. Failure to exhaust is an affirmative defense that must be raised by a defendant, and on which the defendant bears the burden of proof. *See Jones v. Bock*, 549 U.S. 199, 216 (2007); *Vandiver v. Corr. Med. Servs., Inc.*, 326 F. App'x 885, 888 (6th Cir. 2009).

The PLRA attempts to eliminate unwarranted federal court interference with the administration of prisons and thus seeks to "affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter v. Nussle*, 534 U.S. 516, 525 (2002). The PLRA also was intended to "reduce the quantity and improve the quality of prisoner suits[.]" *Id.* at 524. Thus, it is essential for a plaintiff to properly exhaust his administrative remedies before filing suit by filing a grievance that complies with the prison grievance system's requirements regarding the allegations made in his complaint.

An untimely or otherwise improperly filed grievance, even though appealed through

13

all steps of a grievance procedure, does not fulfill the exhaustion requirement of 42 U.S.C. § 1997e(a). *See Northington v. Abdellatif*, No. 16-12931, 2019 WL 9406499, at *7 (E.D. Mich. Aug. 16, 2019) ("The exhaustion requirement is mandatory and requires a prisoner to comply with state procedural rules such as time limits for filing grievances and other critical procedural rules."). Permitting an untimely or otherwise improperly filed grievance, even though appealed through all steps, to satisfy § 1997e(a)'s requirement "would permit a prisoner to bypass deliberately and flagrantly administrative review without any risk of sanction." *Woodford*, 548 U.S. at 97. The *Woodford* court explained:

> A prisoner who does not want to participate in the prison grievance system will have little incentive to comply with the system's procedural rules unless noncompliance carries a sanction…. For example, a prisoner wishing to bypass available administrative remedies could simply file a late grievance without providing any reason for failing to file on time. If the prison then rejects the grievance as untimely, the prisoner could proceed directly to federal court. And acceptance of the late grievance would not thwart the prisoner's wish to bypass the administrative process; the prisoner could easily achieve this by violating other procedural rules until the prison administration has no alternative but to dismiss the grievance on procedural grounds. We are confident that the PLRA did not create such a toothless scheme.

*Id.* at 95. "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones*, 549 U.S. at 218.

### 2. The MDOC's Exhaustion Procedures

In determining whether a plaintiff has properly exhausted his claim, the only relevant rules "are defined not by the PLRA, but by the prison grievance process itself."

14

*Id.* at 200.   In Michigan's correctional facilities, prisoner grievances are governed by MDOC Policy Directive 03.02.130, entitled "Prisoner/Parolee Grievances" (the "Policy"). (ECF No. 75-2).   A state prisoner must first complete the process outlined in the Policy – including, where applicable, pursuing a grievance through "all three steps of the grievance process" – before he can file a lawsuit challenging the alleged unlawful conduct. (*Id.* at ¶ C).

The Policy provides that if a prisoner cannot resolve his dispute with the staff member involved within two business days after becoming aware of the grievable issue, he has five business days to file a Step I grievance.  (*Id*. at ¶¶ Q, W).  After receipt of the grievance, the grievance coordinator must determine if the grievance should be rejected pursuant to the Policy.  (*Id.* at ¶ Y).  If the grievance is rejected, the grievance response shall state the reason for the rejection without addressing the merits of the grievance.  (*Id.*). If the prisoner is dissatisfied with the Step I response, he may submit the grievance appeal to the Step II grievance coordinator within ten business days after receipt of the Step I response, or if no timely response is received, within ten business days of the date the response was due.  (*Id.* at ¶ JJ).  After receipt of the grievance, the grievance coordinator must determine if the grievance should be rejected pursuant to the Policy; if so, the grievance response shall state the reason for the rejection without addressing the merits of the grievance.  (*Id.* at ¶ EE).  If the grievant is dissatisfied with, or does not receive, a Step II response, he has ten business days within which to file a final appeal at Step III.  (*Id.* at ¶ HH).  Again, an inmate may only pursue a claim in court if he has complied with his obligations at each of these three steps.

### 3.    Analysis of Wolfenbarger's Exhausted and Unexhausted Claims:

Wolfenbarger identifies several grievances as relevant to this lawsuit – LCF-445, LCF 679, LCF 325, ARF-791, ARF-238, ARF-284, TCF 724, TCF 63, TCF 48.  (ECF No. 16, PageID.111).  In support of their motion, Defendants provide Wolfenbarger's "MDOC Prisoner Step III Grievance Report," which shows that Wolfenbarger pursued those grievances through all three steps of the grievance procedure. (ECF No. 75-3, PageID.1469-76).  However, Defendants only address the LCF and ARF grievances.  Thus, only those grievances are detailed below: [4]

| Grievance No. | Defendant(s) Grieved | Issues Grieved at Step I | Step I Date[5] |
|---|---|---|---|
| **LCF-445** (PageID.1504-06) | LCF staff: Warden Morrison, Transfer Coordinator, "staff member who sent the negative report to Gus Harrison Correctional Facility which led to the assault against me." (PageID.1506). | Unwarranted transfer to LCF, missing property, told that he was on "someone's shit list" and being "savagely beaten." (*Id.*). | 6/3/22 |
| **ARF-791** (PageID.1497-1503) | John Doe 1 who told Wolfenbarger he was "on someone's shit list," John Does 3 and 4 working the officer station at ARF, John Doe 5 in the ambulance with him, Inspector West. | "[S]taff at ARF acted in concert with the wishes of staff at LCF… to have this assault take place… Conspiracy to cause great bodily harm."  (*Id.*). | 6/3/22 |
| **LCF-679** (PageID.1492-96) | LCF Warden Morrison, "John Doe's at LCF," including the "LCF staff | Retaliatory transfer resulting in "loss of property, work assignment, and | 6/28/22 |

---

[4] All PageID.____ references in the chart are to ECF No. 75-3.

[5] The date that Wolfenbarger filled out the grievance, as indicated by the entry in the "Today's Date" portion of the form.

| | | | |
|---|---|---|---|
| | members involved in my transfer beyond Warden Morrison." (PageID.1494) | hospitalization after a savage beating…" (*Id.*) | |
| **ARF-238** (PageID.1487-91) | Inspector West | Assault at ARF on May 1, 2022 by unknown assailant, lack of a "SPON" notice to prevent another attack, and requesting the identity of the assailant. (*Id.*). | 2/23/23 "ongoing" |
| **ARF-284** (PageID.1477-82) | ARF officer who was working intake (John Doe 1), his "shift command superior," (John Doe 2), two ARF housing unit officers "who were 20 feet away from the assault in their view…" (John Does 3 and 4) (PageID.1480) | Transfer "from LCF to ARF in retaliation for addressing dangerous mold conditions." ARF officers told Wolfenbarger that he was being singled out and then he was assaulted in view of the housing unit officers and not given an escort to medical. (*Id.*). | 2/23/23 "ongoing" |
| **LCF-325** (PageID.1483-86) | Warden Morrison, Deputy Wardens Chrisman and Rurka, RUM Kline. (PageID.1485). | Retaliatory transfer "from LCF to ARF for exercising [his] right's [sic] as chairman of the Warden's Forum." Assault, which caused him to lose his "high paying job," undergo "physical and mental abuse," and suffer "permanent medical issues along with the loss of property." (*Id.*). | 4/4/23 "ongoing" |

### a.    *LCF-445*

Defendants argue that Wolfenbarger's LCF-445 grievance was not exhausted because it was properly rejected for being untimely at Step II.  However, because it was rejected – improperly, as discussed below – at Step I for being "non-grievable," the traditional three step grievance process was closed to Wolfenbarger and Defendants cannot rely on a subsequent rejection as a basis for arguing the grievance was not properly

exhausted.

Under MDOC's grievance policy in effect when Wolfenbarger filed his Step I grievances, a grievance that is rejected at Step I for being "non-grievable" may serve as the basis for exhaustion even if the prisoner does not appeal it through all three steps. "[I]t is well-established that a prisoner 'cannot be required to exhaust administrative remedies regarding non-grievable issues.'" *Elliot v. Snyder*, No. 2:18-CV-0085, 2019 WL 2146923, at *1 (W.D. Mich. Apr. 23, 2019), report and recommendation adopted, 2019 WL 2137413 (W.D. Mich. May 16, 2019) (collecting cases) (quoting *Figel v. Bouchard*, 89 F. App'x 970, 971 (6th Cir. 2004)).[6]

This holding applies whether or not the "non-grievable" designation was proper, unless defendants show there is some other administrative remedy outside the formal grievance process available to the plaintiff. For example, in *Hardrick v. Huss*, No. 2:21-CV-00229, 2023 WL 4872347, at *5 (W.D. Mich. June 20, 2023),[7] of two grievances rejected for presenting "non-grievable" issues, the district court found that one rejection was proper, and one was improper. Regardless, "[t]he question that remain[ed] is whether Hardwick had an alternative administrative remedy available to him." *Hardrick*, 2023 WL 4872347, at *5. The plaintiff had been referred to the Warden's Forum to resolve his "non-

---

[6] MDOC's grievance policy was later changed to require "prisoners to appeal grievances that were rejected at Step I as raising non-grievable issues 'since the non-grievable designation may be overturned at Step II or Step III.'" *Dorsey v. Audu*, No. 24-10519, 2025 WL 3029565, at *4 (E.D. Mich. Sept. 9, 2025), report and recommendation adopted, No. 24-CV-10519, 2025 WL 3027229 (E.D. Mich. Oct. 29, 2025). But the MDOC's grievance policy that existed when Wolfenbarger filed his grievances in 2022 did not contain that language. (*See* ECF No. 75-2).

[7] Report and recommendation adopted, 2023 WL 4865087 (W.D. Mich. July 31, 2023).

18

grievable" issues, but the *Hardrick* court found that defendants had not carried their burden to show that the Warden's Forum was available to plaintiff, who was in administrative segregation at the relevant time. *Id.*

Similarly, in *Lopp v. Washington*, No. 1:19-CV-540, 2021 WL 3033266, at *2 (W.D. Mich. July 19, 2021), the Step I respondent rejected plaintiff's grievance for being "non-grievable" and referred plaintiff to the Warden's Forum. The court, however, determined the Warden's Forum was not a viable option, not because the plaintiff was in administrative segregation, but because the grievance was improperly rejected as "non-grievable." *Lopp*, 2021 WL 3033266, at *2. The plaintiff, the court reasoned, did not "challenge a prison policy or procedure as a whole," which would have been appropriate for the Warden's Forum, but argued that he was the victim of a constitutional violation and asked for redress, which is appropriate for the grievance process. *Id.* Since the grievance procedure had been closed to him and the Warden's Forum was not a proper avenue for grieving personal, constitutional violations, the plaintiff had no available administrative remedy and his grievance was deemed exhausted. *Id.*

As in *Lopp*, Wolfenbarger's grievance was improperly rejected at Step I for being "non-grievable," and the Warden's Forum was not a proper avenue to address the concerns he raised. The Step I respondent wrote, "Rejected per PD 0.3.02.130 - Non-Grievable; other. Mutual concerns amongst the prisoner population area best addressed as outlined in PD 04.01.150. See Attached."[8] (ECF No. 75-3, PageID.1506). However, Wolfenbarger's

---

[8] The grievance documents Defendants' filed with the Court do not appear to include the attachment. Wolfenbarger indicates that the policy refers to the Warden's Forum. (ECF No. 86,

19

LCF-445 grievance focuses on issues specific to himself, not group concerns.  Specifically, Wolfenbarger writes in LCF-445 that "[o]n the morning of 5-1-22 I was savagely beaten," explaining that his attack was caused by the "the retaliatory transfer from LCF for addressing the mold…" (*Id.*, PageID.1506).  He explains that as part of that "retaliatory transfer," "[c]lose to $1,000 of [his] property disappeared along with irreplaceable paperwork" and that "[u]pon arriving at ARF [he] was warned by an officer that [he] was on someone's 'shit list,' 'pissed someone off,' and was being moved to a unit full of prisoner[s] awaiting custody increase transfers." (*Id.*).  These are violations personal to Wolfenbarger and "the Warden's Forum is not an appropriate place to argue that a specific prisoner's constitutional rights were violated." *Lopp*, 2021 WL 3033266, at *2.  As in *Lopp*, Wolfenbarger "does not challenge a prison policy or procedure, nor does he ask the Court to invalidate any prison policy or procedure.  Thus, the Warden's Forum was not the proper venue to present his claims; the grievance process was." *Lopp*, 2021 WL 3033266, at *2.

Moreover, under the above-cited caselaw, even if the LCF-445 grievance was properly rejected for being non-grievable, the Court would still need to analyze whether Wolfenbarger was able to address it elsewhere.  As discussed above, the Warden's Forum was not the appropriate forum.  The respondent told Wolfenbarger to utilize PD 04.01.150 to address his grievance, but if there was any avenue open to Wolfenbarger as part of that policy, Defendants don't address it.  Defendants do not suggest that Wolfenbarger could

---

PageID.1570) ("ROHRIG… refer[red] to the issues as 'non-grievable' and concerns best raised to the Warden's Forum (PD 04.01.150)). *Id.*

have utilized this policy, nor do they even include a copy of the policy with their exhibits. As in *Hardrick*, Wolfenbarger was not in general population at the time he submitted the LCF-445 grievance. Wolfenbarger avers that he was in a "fragile/frail convalescence unit," which like the administrative segregation unit in Hardrick, may have imposed additional restrictions on Wolfenbarger's access to the Warden's Forum or other administrative remedies. Since the grievance process had been closed to him and there is at least a genuine issue of fact whether Wolfenbarger had an alternate pathway available to him to exhaust his grievance, his Step I grievance exhausted the claims therein.

As to the claims exhausted by this grievance, Defendants argue that LCF-445 "grieves only the retaliatory transfer, the loss of his property, and his assault. These correspond to only 2 of the 12 counts raised in the amended complaint, Counts 4 and 9." (ECF No. 90, PageID.1647). However, in addition to Counts 4 and 9, "the retaliatory transfer" and the "assault" also correspond to substantive claims in Counts 2, 3, 6, 10, and 11.

Thus, Defendants' summary judgment motion should be denied as to Count 2 (*Monell* claim "based on Morrison's… retaliatory actions"), Count 4 (First Amendment retaliation), and Count 10 (equal protection based on status as a "clerk")[9] against LCF Warden Morrison; and Count 3 (civil conspiracy), Count 6 (intentional infliction of emotional distress), Count 9 (Eighth Amendment deliberate indifference) and Count 11

---

[9] Wolfenbarger only alleges Count 10 against Warden Morrison.  (ECF No. 16, PageID.178-79).

(civil RICO conspiracy) against Warden Morrison, the LCF transfer coordinator,[10] John Doe 1 who warned Wolfenbarger that he was on "someone's 'shit list,'" and the "LCF staff member who sent to the negative report to [ARF] which led to the assault."[11] (ECF No. 75-3, PageID.1506).[12]

### b. ARF-791

Defendants argue that Wolfenbarger's ARF-791 grievance was not exhausted because it was properly rejected as untimely at Step I. Wolfenbarger does not dispute that ARF-791 was filed outside the deadline provided in the Policy, but argues that the grievance should have been accepted because he had a valid reason for the delay.

To exhaust a grievance, an inmate must comply with the requirements of the grievance procedure. *Woodford*, 548 U.S. at 95-97. The Policy provides that if a prisoner cannot resolve his dispute with the staff member involved within two days after becoming aware of the grievable issue, he has five business days to file a Step I grievance. (ECF No. 75-2, ¶ W). The Policy provides that an untimely grievance "shall be rejected by the Grievance Coordinator," unless "there is a valid reason for the delay; e.g., transfer." (*Id.*, at ¶ J(5)).

---

[10] In his response brief, Wolfenbarger identifies Scott Cline as the "acting Transfer Coordinator" and therefore this grievance exhausts claims as to Scott Cline. (ECF No. 86, PageID.1571).

[11] In his response brief, Wolfenbarger appears to identify this "LCF staff member" as "Matthews" and thus this grievance exhausts claims as to Matthews. (ECF No. 86, PageID.1571).

[12] Wolfenbarger also grieves that "[c]lose to $1,000 of [his] property disappeared along with irreplaceable paperwork" when he "was escorted by the SRT team from [his] housing unit for a transfer to [ARF]." (ECF No. 75-3, PageID.1506). But since Wolfenbarger doesn't identify anyone who was responsible for the alleged "property disappear[ance]," LCF-445 does not exhaust any claim related to Wolfenbarger's loss of property upon his transfer to ARF.

Wolfenbarger filed ARF-791 at Step I on June 3, 2022. (ECF No. 75-3, PageID.1499). He wrote that the "Date of Incident" was both April 29, 2022 and May 1, 2022, and went on to describe the alleged "conspiracy" and resulting assault against him. (*Id.*). He indicated that in attempting to meet the Policy's deadlines, he acted "as soon as [he] could considering the surgeries [he] received, the concussion and pain [he] was in." (*Id.*). The grievance reviewer rejected the grievance as "untimely," indicating only that "you have exceeded your time limits in filing a grievance on issue(s) that concern you, and at the same time provided no reasonable circumstance beyond your control that would have prevented you from filing this grievance in a timely fashion." (*Id.*, PageID.1500).

Under the Policy, Wolfenbarger had until no later than May 3 to address his grievance informally, and then until May 10 (five business days later) to file his Step I grievance. (ECF No. 75-2, ¶ W). Although Wolfenbarger filed the Step I grievance on June 3, 2022, a month after the incident, a question of fact exists as to whether he had a "valid reason for [the] delay" and whether the rejection of his grievance as "untimely" was proper. (ECF No. 75-2, ¶ W).

In *Reeves v. Florek*, No. 24-11653, 2025 WL 2780144, at *3 (E.D. Mich. Sept. 30, 2025), the court recently explained that "defendants bear the burden of showing that the grievance screener's reasoning for the rejection was proper under the facts." (citing *Bailey v. Michigan Dep't of Corr.*, 2020 WL 4934314, at *5 (E.D. Mich. Aug. 24, 2020)) (questionable rejection of a grievance "raises a question of fact because an improper rejection would constitute exhaustion"). Under the limited facts before the Court, the Defendants here don't meet that burden. The grievance reviewer merely wrote, in

23

conclusory fashion that Wolfenbarger "exceeded [his] time limits" and "provided no reasonable circumstance" that would justify the delay, apparently giving no consideration to the fact that Wolfenbarger's grievance (1) alleged that he had been "savagely assaulted" just a few weeks earlier, "leading to fractures, lacerations, surgeries, a concussion, and hearing loss;" (2) specifically referenced acting "as soon as [he] could considering the surgeries [he] received, [and] the concussion and pain [he] was in;" and (3) indicated that he was "in the hospital."  Thus, while Wolfenbarger submitted the grievance beyond the timeframe specified in the Policy, nothing in the grievance response allows the Court to find that the rejection was proper.

In their motion, Defendants argue that the fact that Wolfenbarger submitted the letters on May 14, 2022, is proof that he could have filed his Step I grievance at least two weeks earlier than he did.  (ECF No. 90, PageID.1648).  While Wolfenbarger doesn't address that narrow contention head-on, he explains additional context surrounding his delay, including that after he was "transferred, suffered the attack, received emergency medical care," he was "hospitalized, concussed, placed within an MDOC fragile/frail convalescence housing unit to heal for *6+ weeks*, cared for by inmates aides, etc…" and that he required the assistance of another inmate to help him write the letters to the Wardens (ECF No. 86, PageID.1569) and the grievances once he was able to submit them.  (*Id.*, PageID.1575) ("Plaintiff was relegated to reliance on fellow prisoner's assistance when writing grievances on his behalf."); (*Id.*, PageID.1576) ("Plaintiff's cognitive abilities were questionable, at best, to objectively and subjectively, review the grievance content written on his behalf, to distinctly verify the wording and policy citations, submit them under

24

deadlines, list proper offenders, charges, etc…").[13]   Taken together, the present record evidence about Wolfenbarger's hospitalization and his physical and mental condition in the weeks following the assault raises a question of fact as to whether he was able to file his grievance within the Policy's deadlines and whether he had a "valid reason" for the delay.

Defendants also argue that ARF-791 was not exhausted because its "vague references to 'staff' are insufficient to put the MDOC Defendants on notice as to the claims against them."  (ECF No. 75, PageID.1452, citing *Hill v. Buchanan,* No. 21-1673, 2022 WL 16580149 (6th Cir. Sept. 8, 2022)).  The Court disagrees.

The relevant MDOC Policy directs prisoners to fill out grievances as follows:

> The issues should be stated briefly but concisely.  Information provided is to be limited to the facts involving the issue being grieved (i.e., who, what, when, where, why, how).  Dates, times, places, and names of all those involved in the issue being grieved are to be included.

---

[13] Defendants argue that this statement can't be taken as evidence because even though Wolfenbarger verified his response brief pursuant to 28 U.S.C. § 1746, "response briefs cannot be transformed into declarations 'sufficient to create an issue of fact for purposes of a summary judgment motion.'"  (ECF No. 90, PageID.1645, citing *Brooks v. Longcore*, No. 1:11-CV-1060, 2012 WL 4501011, at *5 (W.D. Mich. June 15, 2012).  But there is sufficient evidence in the record to support his statement read as an argument, not as substantive "evidence" in its own right.  For example, in Wolfenbarger's letter to Warden Morrison, he explains that he is "still under a doctor's care with [his] jaw wired shut and suffering from the effects of a concussion."  (ECF No. 75-3, PageID.1496).  The record evidence also includes Wolfenbarger's ARF-791 Step I grievance indicating that he wrote Warden Campbell "as soon as [he] could considering the surgery [he] received, the concusion [sic] and pain."  (*Id.*, PageID.1499). Thus, Wolfenbarger's statement that, while under the doctor's care and still healing, he was unable to write a grievance and was reliant on the help of other inmates is an argument which finds evidentiary support in the record. Additionally, Defendants do not appear to factually contest the nature of the harm Wolfenbarger suffered from the attack.  Thus, the Court considers Wolfenbarger's arguments related to the effects of the attack on him, which Defendants do not put forth any evidence to rebut.

(ECF No. 75-2, PageID.1462).

Although the policy directs inmates to include the names of "all those involved," the fact that Wolfenbarger did not have the names of all these individuals at the time he filed the grievance does not make those individuals forever non-grievable. "[I]t is sufficient for a court to find that a prisoner's [grievance] gave prison officials fair notice of the alleged mistreatment or misconduct that forms the basis of the constitutional or statutory claim made against a defendant in a prisoner's complaint." *Hall v. Raja*, No. 09-10933, 2010 WL 3070145, at *4 (E.D. Mich. Apr. 26, 2010) (quoting *Bell v. Konteh*, 450 F.3d 651, 654 (6th Cir.2006)). *See also Johannes v. Washington*, No. 14-11691, 2016 WL 1253266, at *9 (E.D. Mich. Mar. 31, 2016) ("courts will find the naming requirement *satisfied* when the prisoner provides a good-enough description of the officer he seeks to grieve such that grievance responders, in exercising reasonable diligence, can identify the officer even if unnamed.") (emphasis in original).

Wolfenbarger does not include the names of those whose conduct he's grieving, but he provides enough detail to put the MDOC on notice of the several officers to which he refers. Wolfenbarger grieves the "ARF officer working intake the evening of 4-29-22 [who] warned [him] that [he] had pissed someone off and was on someone's shit list and was to be sent to the unit full of higher custody prisoners awaiting transfer." (ECF No. 75-3, PageID.1499). That was sufficient information for a grievance reviewer to determine the subject's identity and investigate Wolfenbarger's complaint. *See Johannes*, 2016 WL 1253266, at *9. Similarly, Wolfenbarger also grieves the "officers stealing and or giving away property of [his], lying on a critical incident report, taking photos of [him] with a

26

personal cell phone on the hospital run, saying things such as 'we should take him back so they can finish the job,' and berating [him] while [he] was on the gurney." (*Id.*). Again, a grievance reviewer would have been able to use that information to at least investigate Wolfenbarger's allegations. While Wolfenbarger did not know the identities of everyone involved, he sufficiently described the individuals by reference to their respective work assignments and alleged conduct on the day in question, which was enough to put the MDOC on "fair notice" of his claims against them.

The *Hill* case cited by Defendants is readily distinguishable from the present case. In *Hill*, one grievance at issue "identified no individual by name and instead referred only to 'healthcare' and 'medical' in general." 2022 WL 16580159 at *3. This grievance, the *Hill* court explained, did not "provide [defendants] sufficient notice to respond to the specific allegations against them that [plaintiff] later presented in his § 1983 complaint." *Id.* In the present case, Wolfenbarger grieves the conduct of the individuals that took him to the hospital, worked in the unit on the day he was transferred and attacked, and the investigators who investigated the attack. His grievance further makes it clear what specific conduct he attributes to each individual. The *Hill* court also evaluated another grievance, finding that because it clearly named five defendants, it did not put an additional two unnamed defendants on notice that "they would be the subject of a later lawsuit." *Id.* But that point is of no consequence here because Wolfenbarger does not aim to add additional individuals not described in the grievance. Rather he seeks merely to proceed against the individuals who, although not identified by name in the grievance, were sufficiently described by their respective alleged wrongful acts.

27

For the foregoing reasons, the Court should deny Defendants' summary judgment motion on the basis of exhaustion as to the "ARF officer" who told Wolfenbarger he was "on someone's shit list," (John Doe 1), the "staff who assigned [Wolfenbarger] to a 2-Unit cell" (John Doe 2),[14] officers at the guard station "20ft away" from where the assault took place (John Does 3 and 4), the "transport officers to the hospital," (John Doe 5), Inspector West and others "involved in the investigation," "critical incident reports," "[i]ncluding the staff who assigned me to a 2-Unit cell." (John Doe 2). Thus, ARF-791 exhausts Count 6 (intentional infliction of emotional distress ("IIED")) against John Does 1 and 5; and Count 3 ("civil conspiracy") and Count 11 ("civil RICO conspiracy") against John Does 1-5.[15]

### c. LCF-679

The Court agrees with Defendants that LCF-679 cannot have exhausted any claims because it was properly rejected as untimely at Step I. (ECF No. 75, PageID.1448-49).

In LCF-679 Step I, Wolfenbarger identifies the "Date of Incident" as "4-29-22" and "Today's Date" as "6-28-22." (ECF No. 75-3, PageID.1494). After being rejected at Step

---

[14] This grievance specifically complains about "staff who assigned [Wolfenbarger] to a 2-Unit cell." (ECF No. 75-3, PageID.1499). In the complaint, Wolfenbarger alleges that John Doe 1 sent him "to living quarters not consistent with his security level" based on "information received from his superior, the 'Shift Commander' [] who was responsible for assigning [Wolfenbarger] a cell" ("John Doe 2"). (ECF No. 16, PageID.134). Therefore, ARF-791 grieves conduct by John Doe 2.

[15] Although Defendants aver that this grievance only exhausts conduct relating to Count 3, Counts 6 and 11 also contain allegations relating to the retaliatory transfer and investigation that is grieved in ARF-791. However, these counts are only exhausted as to claims related to the transfer, attack, and follow-up investigation, not claims relating to threats prior to transfer, stolen property, or mail confiscation. *See supra* at 22, n.12; *infra* at 39-40.

I for being untimely,[16] Wolfenbarger's Step II appeal was rejected because it was "[s]ubmitted outside allotted time at Step II making it untimely per PD 03.02.130. Additionally, the Step I copies for this grievance was not attached."  (*Id.*, PageID.1493). At Step III, the rejection was upheld.  (*Id.*, PageID.1497).

Approximately two months passed between the date of incident and Wolfenbarger's Step I grievance.  Regarding ARF-791, the Court found above that a question of fact exists as to whether, during the few weeks after Wolfenbarger wrote letters to the Wardens, he was also able to file grievances.  *See supra* at 22-25.  However, given that Wolfenbarger actually submitted a grievance on June 3, 2022, he simply has not raised a material question of fact whether he was still unable to file grievances more than three weeks later.[17]

Accordingly, to the extent Defendants argue that LCF-679 cannot have exhausted any claims, summary judgment should be granted in their favor.

### d.      ARF-238

Defendants argue that ARF-238 cannot have exhausted any claims because it was properly rejected as untimely at Step I.  (ECF No. 75, PageID.1451).  The Court disagrees.

---

[16] The respondent also wrote that Wolfenbarger "failed to provide required number of form copies which would further delay processing, making it more untimely.  See Attached." (ECF No. 75-3, PageID.1495).

[17] Wolfenbarger argues in his response brief that he had a "valid reason for delay" because he first "submitted a Staff Corruption grievance directly to MDOC Internal Affairs on 6/8/22," to which an "Internal Affairs representative responded by returning the submission on 8/22/22, instructing the [Wolfenbarger] to submit the grievance to LCF."  (ECF No. 86, PageID.1574).  Wolfenbarger wrote on the grievance: "Returned to grievant 8-22-22 from MDOC Office of Legal Affairs as a direct to Step 3 Staff Corruption Grievance with instructions to submit to LCF Grievane [sic] Coor. for processing in accordance with 03.02.130."  (ECF No. 75-3, PageID.1494).  However, Wolfenbarger's choice to first submit the grievance elsewhere is not a "valid reason for delay."

In this grievance, Wolfenbarger grieves Warden Campbell and Inspector West's alleged continued refusal to reveal to him the "identity of his assailant." (ECF No. 75-3, PageID.1490). He explains:

> I asked for the identity of the assailant but was told I could not have that information because of possible retaliation from me. On 5-15-22, I wrote a complaint to the ARF warden asking for the identity of the assailant. No reply was ever made. As of today's date, I have no idea who committed the assault, and there is no SPON notice in my file preventing this person from doing so again…. My claims are against the ARF Warden and the ARF inspector who visited me in the hospital. Those staff clearly know that another assault can take place and their inaction is assuring it."

(*Id.*).

The grievance is timely because Wolfenbarger is grieving an ongoing denial of requested information. Indeed, he writes in the grievance, "[a]s of today's date, I have no idea who committed the assault, and there is no SPON notice in my file preventing this person from doing so again." (*Id.*). As Wolfenbarger grieves a then-present threat to his safety, the grievance was timely. *See Ellis v. Vadlamudi*, 568 F. Supp. 2d 778, 783–84 (E.D. Mich. 2008) (finding that "a condition is properly identified as 'ongoing,' and a grievance that identifies the persistent failure to address that condition must be considered timely as long as the prison officials retain the power to do something about it.").

Thus, Count 6 for intentional infliction of emotional distress caused by "Inspector West refus[ing] to notify Plaintiff of assailants identity nor acknowledge[] any measures taken to prevent another assault" is exhausted. (ECF No. 16, PageID.171).[18]

---

[18] As noted above, Wolfenbarger has agreed to dismiss his claims against Warden Campbell. *See supra* at 2 n.2.

30

### e.    *ARF-284*

The Court agrees with Defendants that ARF-284 was properly rejected at Step I for being untimely.  The Step I grievance describes the transfer, attack, and allegations that "officers made up a false narrative as to why the assault took place to cover up their part in it."  (ECF No. 75-3, PageID.1480).  Wolfenbarger writes that the "Date of Incident" is "5-1-2022 ongoing" and that "Today's Date" is "2-23-2023 ongoing."  (*Id.*).  However, Wolfenbarger grieves no "ongoing" issues in this grievance,.  Instead, his complaints are about past conduct, most all of which being the exact conduct he complained about in other grievances he filed months earlier.  (*Id.*).  At Step I, the grievance was rejected as untimely and the respondent correctly wrote that Wolfenbarger "provided no reasonable circumstance beyond [his] control that would have prevented [him] from filing this grievance in a timely fashion."  (*Id.*, PageID.1482).  At Steps II and III, the rejection was upheld.   (*Id.*, PageID.1479, 1477).   Wolfenbarger's only response in the grievance paperwork was to point out that he was "still being medically cared for as a result of the injuries [he] sustained due to the negligence and corruption of ARF staff."   (*Id.*, PageID.1478).  But the fact that Wolfenbarger may have continued to feel the *effects* of the challenged conduct into the future does not mean he could indefinitely extend the deadline for grieving the *conduct* that allegedly caused those effects.  Indeed, his obligation under the Policy was to commence the grievance process within a specified number of days "after becoming aware of a grievable issue . . ."  (ECF No. 75-2, ¶ Q).[19]

---

[19] Additionally, the Court notes that this grievance is aimed only at Warden Campbell (ECF No. 75-3, PageID.1481) ("I name Warden Campbell . . ."), but, as noted above, *supra* at 2 n.2,

Thus, Defendants are entitled to summary judgment on their argument that ARF-284 was properly rejected as untimely at Step I and does not exhaust any claims.

### f. LCF-325

Defendants argue that LCF-325 was properly rejected at Step II for being untimely.[20] According to the Policy, a prisoner may appeal the Step I grievance response to the Step II grievance coordinator within ten business days after receipt of the Step I response, or if no timely response is received, within ten business days of the date the response was due. (ECF No. 75-2 at ¶ JJ). "Grievances and grievance appeals at all steps shall be considered filed on the date received by the Department." (*Id.* at ¶ T).

At Step I, Wolfenbarger writes that the "Date of Incident" was "4-29-22 ongoing" and that "Today's Date" is "4-4-23 ongoing." (ECF No. 75-3, PageID.1485). Also on the Step I grievance form is the grievance respondent's reply, signed on April 10, 2023, along with a "Date Received by Grievant" of April 11, 2023. (ECF No. 75-3, PageID.1485). Although Wolfenbarger would normally have had 10 business days, or until April 25, 2023, to file the Step II appeal, the Step II form indicates that he was granted additional time to account for mailing to LCF from where he was housed.[21] Indeed, the LCF-325 Step II

---

Wolfenbarger has agreed to dismiss his claims against that defendant.

[20] LCF-325 was also rejected at Step I for being "duplicative to LCF-23-3-243-28E" ("LCF-243") (ECF No. 75-3, PageID.1485). The Court doesn't have LCF-243 and Wolfenbarger doesn't claim that he pursued that grievance through the three-step process. Indeed, Wolfenbarger wrote on his Step II appeal of LCF-325 that "[t]his grievance was written after 6 weeks of no receipt nor acknowledgment of the prior submission of [LCF-243] from LCF staff," suggesting that he abandoned the grievance. (ECF No. 75-3, PageID.1484). Since the Court does not have the original grievance, it cannot weigh whether the rejection for being "duplicative" was proper.

[21] It is unclear where Wolfenbarger was housed during this time. The Step III response to this

32

appeal form says, "If you should decide to appeal the Step I grievance response to Step II, your appeal should be directed to G/C by 5-4-23.  If it is not submitted by this date, it will be considered terminated.  with X days added for mailing."  (ECF No. 75-3, PageID.1484) (emphasis added).[22]

Wolfenbarger wrote on the Step II appeal form that "Today's Date" was 4-30-23," six days before proposed "5-4-23" deadline.  (*Id.*).  Yet, since the Step II respondent at LCF allegedly did not receive Wolfenbarger's Step II appeal until May 9, 2023, five days after Defendants' characterization of the new deadline, it was rejected it as untimely.[23]  However, construing the evidence in the light most favorable to Wolfenbarger, the Court finds at least a question of fact as to the timeliness of Wolfenbarger's Step II appeal.  First, it is reasonable to conclude that the instructions on the Step II form gave Wolfenbarger until May 4, 2023, to "submit" or "direct" his grievance, which would render his Step II appeal timely.  Second, as just noted, the "Date Received" box on Wolfenbarger's Step II appeal form is blank, so there is a question of fact as to when it was actually received by the reviewer.  Finally, Wolfenbarger was sending grievances and receiving responses between institutions, which means the person setting the deadline would not have known when Wolfenbarger would receive back the form and whether that would give him enough

---

grievance states that Wolfenbarger is housed at TCF.  (ECF No. 75-3, PageID.1483).

[22] The underlined portion was hand-written.  Its meaning is not entirely clear.

[23] The Step II respondent did not actually fill out the blank for "Date Received by Step II Respondent," so the Court references the date that the respondent signed the Step II appeal.  (ECF No. 75-3, PageID.1484).

time to mail it back again.  Depending on when he received the Step I grievance, he may

have had little to no chance of it being "received" by the respondent by the deadline, which

begs the question of whether the grievance process, in this particular instance, was

available to Wolfenbarger.  *See Bailey v. Washington*, 785 F.Supp.3d 997, 1004 (E.D.

Mich. 2025) ("At Step I, prisoners are required to 'send' their completed grievance form

"[w]ithin five business days after attempting to resolve a grievable issue with staff." []

Notwithstanding the word 'send,' the rules somehow also suggest that the Department

needs to receive the grievance form within five business days after the attempted

resolution. [] But the mail can take longer than five business days.").

While the foregoing is a sufficient basis to reject Defendants' argument, the Court

also notes that Defendants' timeline appears not to add up.  It is unclear when Wolfenbarger

actually received the Step I grievance response, since the "Date Returned to Grievant" of

April 11, 2023, appears implausible.  LCF ADW Rurka signed the Step I grievance on

April 10, 2023, and it still had to be mailed to Wolfenbarger at TCF before he could receive

it.  The other grievances that had to be mailed from ARF to TCF took a substantial amount

of time.  For example, ARF-238 says "Date Returned to Grievant" was March 14, 2023,

but Wolfenbarger appears not to have received it until April 7, 2023.[24]  (ECF No. 75-3,

PageID.1488, 1490).  Since Rurka signed the grievance form on April 10, 2023, and in

light of the other evidence about the length of time between similar mailings, it seems

---

[24] Wolfenbarger writes that he received it on "4-4-7-23," which the Court reads as April 7, 2023.
(ECF No. 75-3, PageID.1488).

implausible that Wolfenbarger would have actually received the Step I grievance on April 11, 2023.

For all of these reasons, Defendants' motion for summary judgment as to Morrison, Chrisman, Rurka, and Cline[25] for their parts in the alleged retaliatory transfer should be denied.  At Step I, after describing the "retaliatory transfer" and the attack, Wolfenbarger writes that

> Warden Morrison authorized the transfer after stating 'no clerks' would be transferred which I was one.  Both Deputy Warden's Chrisman and Rurka bare [sic] responsibility and spoke with me while I awaited transfer and said I would be returned to LCF soon which was 11 months ago. I name the transfer coordinator the transfer and subsequent assault.  RUM Kline who the original complaint for negligence concerning mold led to this act of retaliation.

(*Id.*).  Thus, LCF-325 exhausts Counts 3, 4, 6 (only as to IIED resulting from the attack), 9, and 11 against Morrison, Chrisman, Rurka, and Cline.[26]

### g.     *Other Claims that Should be Dismissed for Failure to Exhaust*

#### i.  *Claims Against Grievance Coordinators Rohrig and Lawson*

Defendants argue that "to the extent that Wolfenbarger might have exhausted any claims with any of [the above-referenced] six Step III grievances, exhaustion would be limited to the specific claims asserted at Step I against the individuals named or identified at Step I." (ECF No. 75, PageID.1446).  In his response brief, Wolfenbarger alleges that

---

[25] In the grievance, Wolfenbarger spells it "Kline," but there is no named defendant "Kline," only Scott "Cline." (ECF No. 16, PageID.110).  Therefore, the Court reads this grievance as exhausting the aforementioned claims against Cline.

[26] This includes the allegations against Cline as transfer coordinator.  *Supra* at 22, n. 10.

he exhausted claims as to Grievance Coordinators Rohrig and Lawson because he grieved their conduct at Step II of multiple grievances. (*E.g.,* ECF No. 86, PageID.1571, 1573, 1574-75). The underlying grievances were ones that were rejected as being "untimely," and in the Step II grievances, Wolfenbarger complains about those rejections and the time it took for him to receive the Step II appeal forms. (*E.g.* ECF No. 75-3, PageID.1498, 1505).[27] The Court agrees that none of those grievances properly exhausted any claims against Rohrig or Lawson.

As discussed above, in general, "a plaintiff fails to exhaust administrative remedies against a defendant if the plaintiff does not name the defendant at Step I of the grievance." *Whorton v. Dinsa,* No. 21-11722, 2022 WL 1216306, at *4 (E.D. Mich. Mar. 28, 2022), report and recommendation adopted, 2022 WL 1213109 (E.D. Mich. Apr. 25, 2022). Since Wolfenbarger didn't name or describe Rohrig or Lawson at Step I of any of the salient grievances, none of the claims against them are exhausted. Wolfenbarger cites *Morgan v. Trierweiler*, 67 F.4th 362, 371 (6th Cir. 2023) to support the proposition that he can exhaust the claims against Lawson and Rohrig by naming them at Step II, but *Morgan* did not involve a plaintiff grieving an individual at Step II who had not been grieved at Step I. Rather, the *Morgan* court merely reiterated the unrelated holding of *Reed-Bey*, which found

---

[27] The Step II appeal form for ARF-791 is somewhat difficult to read, but clearly complains about the Step I reviewer's decision to reject the grievance as untimely. (*Id.*, PageID.1498-1500). Wolfenbarger explains that he "included, by conduct and name, Lawson in the conspiracy in Step II." (ECF No. 86, PageID.1573). While the Court's review of the Step II paperwork does not find a specific reference to "Lawson," even if it did, it was merely in the context of his complaints about the grievance's rejection and mailing of the Step II paperwork. As discussed herein, however, those Step II complaints do not exhaust a grievance against Lawson.

36

that if the MDOC addresses a grievance on the merits, it can't later argue that the prior rejection is a basis for finding the grievance not properly exhausted. *Id*. That holding is simply not applicable here, where the MDOC did not address the grievances on the merits as to Rohrig or Lawson, but rather merely continued to uphold the Step I untimeliness finding. (ECF No. 75-3, PageID.1497, 1504).

For all of these reasons, Wolfenbarger's claims against Lawson and Rohrig are not exhausted, and those defendants are entitled to summary judgment in their favor.[28]

### ii.   *Claims Against Director Heidi Washington*

Defendants also ask the Court to grant summary judgment as to Wolfenbarger's claims against Director Washington on the grounds that exhaustion is limited to "the individuals named or identified at Step I," and none of his exhausted grievances specifically identify Director Washington. (ECF No. 75, PageID.1446).

Wolfenbarger is suing Washington in her official capacity only (ECF No. 16, PageID.110), which claims "generally represent only another way of pleading an action against an entity of which an officer is an agent," *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 n. 55 (1978), and are only viable to the extent the plaintiff has identified a policy or custom that was the moving force behind a constitutional injury. *Turner v. City of Taylor*, 412 F.3d 629, 639 (6th Cir. 2005); *Alkire v. Irving*, 330 F.3d 802, 815 (6th Cir. 2003). A plaintiff may show such a policy by identifying "(1) the [entity]'s

---

[28] Moreover, the law is clear that "a prisoner [] does not have a constitutionally-protected interest in an inmate grievance procedure or the right to an effective procedure." *Moss v. Dyer*, No. 23-12119, 2023 WL 8190693, at *2 (E.D. Mich. Nov. 27, 2023). Thus, Wolfenbarger's claims based on conduct of grievance reviewers also fail as a matter of law. *Id.*

legislative enactments or official policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal violations." *Baynes v. Cleland*, 799 F.3d 600, 621 (6th Cir. 2015) (citing *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)).

Here, however, despite suing Washington in her official capacity only, Wolfenbarger's claims against her do not challenge an actual MDOC policy, which challenges are not grievable.  (ECF No. 75-2, ¶(J)(8)) ("A grievance shall be rejected by the Grievance Coordinator if: . . . The prisoner is grieving the <u>content</u> of the policy or procedure . . .") (emphasis in original).  Rather, his claims are aimed at Washington allegedly being part of civil and RICO conspiracies (Counts 3 and 11) and purposefully acquiescing to Morrison's alleged wrongful conduct (Count 12).  Thus, the exhaustion requirements apply.

A review of the exhausted grievances confirms Defendants' contention that Wolfenbarger did not name Director Washington in any of them.  Therefore, for the reasons explained above, Wolfenbarger's claims against Director Washington should be dismissed for failure to exhaust.[29]

---

[29] Wolfenbarger's official capacity claims against Washington are also subject to dismissal for failure to state a claim pursuant to 28 U.S.C. § 1915(e), which requires the Court to dismiss an in forma pauperis prisoner case if, "at any time," the Court finds that the action "fails to state a claim on which relief may be granted . . ."  28 U.S.C. § 1915(e)(2)(B)(ii).  As just discussed, an official capacity claim is one that challenges a policy or custom that was the "moving force" behind a constitutional violation.  Wolfenbarger's only claim that even comes to such a challenge is Count 12, in which he alleges that Washington acquiesced in Morrison's custom, pattern, or practice of engaging in "cruel and unusual punishment of deliberate indifference to the health and safety of a prisoner."  (ECF No. 16, PageID.183-84).  Not surprisingly, then, the only facts Wolfenbarger pleads regarding Washington relate to her alleged acquiescence regarding "mold," poor "social distancing" amongst inmates during the COVID-19 pandemic, and "contaminated water" at LCF.

### iii.   Claims Against TCF Staff

In his complaint, Wolfenbarger names two TCF employees: R. Buhl and "Mailroom Supervisor."  (ECF No. 16, PageID.114-15).  Neither employee is referred to in any of the above-discussed grievances, all of which were filed at LCF and ARF.  However, Wolfenbarger averred in his amended complaint that he exhausted three grievances at TCF.  (ECF No. 16, PageID.111).  And Wolfenbarger's Step III report shows that those three grievances were exhausted.  (ECF No. 75-3, PageID.1473).  Although these grievances were exhausted after Wolfenbarger filed his original complaint, all three were exhausted before Wolfenbarger's amended complaint, which added the TCF employees to the action.  (*Id.*).  Thus, at least on the record before the Court, summary judgment is not appropriate to the TCF defendants who were added as named defendants in the amended complaint, which was filed after the TCF grievances were exhausted.  *Mattox v. Edelman*, 851 F.3d 583, 595 (6th Cir. 2017) ("[W]e hold that the PLRA and Federal Rule of Civil Procedure 15 permit a plaintiff to amend his complaint to add claims that were exhausted after the commencement of the lawsuit, provided that the plaintiff's original complaint contained at least one fully exhausted claim.").

### iv.   Claims Related to Threats against Wolfenbarger Prior to his Transfer

---

(*Id.*).  Those matters clearly relate only to Count 8, which, as noted above, Wolfenbarger has agreed to dismiss. *See supra* at 11 n.3.  Importantly, Wolfenbarger pleads no facts whatsoever suggesting that Washington acquiesced in the alleged retaliation Wolfenbarger suffered, which is the subject of Counts 3 and 11.  Accordingly, Wolfenbarger fails to state a claim for relief against Washington as to any of the counts against her – Counts 3, 11, and 12 – and Washington should be dismissed pursuant to § 1915(e)(2)(B)(ii).  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'") (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Counts 1, 4, 6, and 11 all relate, in part, to allegations that staff threatened Wolfenbarger to coerce him to reveal who was speaking to the reporter, Paul Egan. No grievance exhausted these claims.

Count 1 is for "First Amendment claims against Morrison, Chrisman, and Rurka based on alleged 'true verbal threats' made in retaliation for protected conduct of communicating with a reporter regarding LCF's alleged inhumane living conditions." (ECF No. 65, PageID.1326, citing ECF No. 16, PageID.157-58; ECF No. 46, PageID.687). More specifically, Wolfenbarger alleges in Count I that

> Morrison threatened the Plaintiff for providing evidence of LCF staff corruption and deliberate indifference to reporter, Paul Egan… The ensuing campaign by Def. Chrisman and Rurka of threats and manipulative pressure were clearly understood by the Plaintiff as unambiguous and blunt…For 8 months, Plaintiff lived in constant fear of *discovery* rooted to repeated explicit verbal threats and an unconstitutional investigation conducted by staff and prisoner "snitches."

(ECF No. 16, PageID.158) (emphasis added).

Wolfenbarger does not allege in any of the grievances that he was threatened prior to his transfer. Rather, to the extent Wolfenbarger's grievances challenged alleged retaliatory conduct by Morrison, Chrisman, and Rurka, they focused on the fact that he was transferred to ARF and then assaulted after he arrived there.

Since Wolfenbarger did not raise the specific alleged pre-transfer threats in any grievance, Count 1 should be dismissed for failure to exhaust. For the same reasons, the part of Count 4 that alleges a "pressured campaign of extortion and coercion" to identify the person who was talking to Egan, and the Count 6 IIED claim that relies on "Morrison's

40

threats of retaliation upon discovering a reporters investigation into staff corruption…" and Wolfenbarger "liv[ing] in emotional distress for eight months while Def. Morrison's edict to uncover his identity and retaliate permeated amongst inmates…" are also not exhausted and should be dismissed.  (ECF No. 16, PageID.170).

### v. Claims Related to the Seizure of Mail Prior to Wolfenbarger's Transfer

Count 5 should also be dismissed against Morrison, Chrisman, Rurka, and Matthews, but not as to the "TCF Mailroom Supervisor." As previously summarized by the Court, Count 5 is for:

> First Amendment claims against Morrison, Chrisman, Rurka, and Matthews based on alleged illegal seizures of [] outgoing prisoner mail and confiscation of exculpatory legal documentation from Wolfenbarger's possession. (ECF No. 16, PageID.167-69; ECF No. 46, PageID.688)

(ECF No. 65, PageID.1326).

Specifically, Wolfenbarger alleges in the complaint that

> Def. Morrison acquiesced Def.'s Chrisman, Rurka and Matthews to uncover Plaintiff's identity and retaliate against him for urging a media investigation into LCF.  Def. Matthews' illegal seizure of outgoing prisoner mail addressed to reporter, Paul Egan, chilled rights of free speech while serving no legitimate penological purpose. Letters placed into secure MDOC USPS mailboxes addressed to, Paul Egan, were never delivered to their destinations as Def. Chrisman admitted to such illegal seizure, constituting federal crimes.  Def. Rurka expressed strong feelings against prisoners contacting the press over LCF staff deliberate indifference and corruption.  Exculpatory legal documentation was confiscated from Plaintiff's property without due process.  This pattern and practice continued when TCF mailroom staff, under the guidance of the Def. Mailroom Supervisor working on April 13, 2023 and July 13, 2023…

(ECF No. 16, PageID.169).

41

None of the grievances discussed above, all of which were filed at LCF and ARF, reference the theft of outgoing mail.  Thus, Wolfenbarger's Count 5 claims against Morrison, Chrisman, Rurka, and Matthews should be dismissed for failure to exhaust.

However, as part of Count 5, Wolfenbarger also alleges that the "TCF Mailroom Supervisor" participated in the alleged "illegal seizure of outgoing prisoner mail." Wolfenbarger alleges that he exhausted three grievances at TCF and his Step III Grievance Report shows the same.  (ECF No. 75-3, PageID.1473).  Accordingly, at least on the present record, summary judgment is not appropriate for Count 5 as it pertains to the TCF Mailroom Supervisor, who was added as a named defendant in the amended complaint, which Wolfenbarger filed after he exhausted the TCF grievances. *See Mattox*, 851 F.3d at 595.

## III. CONCLUSION

For the foregoing reasons, **IT IS RECOMMENDED** that Defendants' Motion for Summary Judgment **(ECF No. 75)** be **GRANTED IN PART** and **DENIED IN PART**. Specifically, Counts 1, 7, 8 and 12 should be **DISMISSED** in their entirety; Counts 4 and 6 should be **DISMISSED** only as to the alleged "pre-transfer" retaliation; Count 5 should be **DISMISSED** as to Morrison, Chrisman, Rurka, and Cline; and defendants Campbell, Rohrig, Lawson, and Washington should be **DISMISSED** from the case.

The remaining claims, pending the Court's ruling on Defendants' motion to dismiss,

are as follows:

- Count 2 *Monell* claim against Morrison;

- Counts 3 and 11 "civil conspiracy" claims against Morrison, Chrisman, Rurka, Cline, Matthews, John Does 1-5, R. Buhl, and TCF "Mailroom Supervisor";

- Count 4 First Amendment retaliation against Morrison, Chrisman, Rurka, and Cline for Wolfenbarger's transfer to ARF and the subsequent assault;

- Count 5 First Amendment retaliation against TCF "Mailroom Supervisor";

- Count 6 intentional infliction of emotional distress against Morrison, Chrisman, Rurka, Cline, John Doe 1, John Doe 5, Inspector West, and Campbell, other than as it relates to alleged "pre-transfer" retaliation;

- Count 9 Eighth Amendment deliberate indifference against Morrison, Chrisman, Rurka, Cline, Matthews, and John Doe 1; and

- Count 10 equal protection against Morrison.

Dated: May 29, 2026
Ann Arbor, Michigan

s/David R. Grand
DAVID R. GRAND
United States Magistrate Judge

**<u>NOTICE TO THE PARTIES REGARDING OBJECTIONS</u>**

Within 14 days after being served with a copy of this Report and Recommendation, any party may serve and file specific written objections to the proposed findings and recommendations and the order set forth above. *See* 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1). Failure to timely file objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). Only specific objections to this Report and

43

Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have. *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006). Copies of any objections must be served upon the Magistrate Judge. *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1). Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on May 29, 2026.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager

44